UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| *IN RE* PETITION OF SOUTH SHORE LAKE ERIE ASSETS & OPERATIONS, LLC FOR LIMITATION OF LIABILITY AND/OR EXONERATION RE: 33' 1987 CHRIS-CRAFT AMEROSPORT MOTOR VESSEL, HULL ID# CCHEA144G687. A.K.A. M/V "THE THIRD LADY" | CASE NO. 1:21-cv-02343<br><br>OPINION & ORDER<br>[Resolving Docs. 48, 49] |
| *IN RE* COMPLAINT OF GAIL OPASKAR, INDIVIDUALLY AND AS THE EXECUTRIX OF THE ESTATE OF DR. FRANK OPASKAR, DECEASED, FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CASE NO. 1:21-cv-02396<br><br>OPINION & ORDER<br>[Resolving Docs. 45, 46] |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In 2021, Dr. Frank Opaskar and his wife, Gail Opaskar (the Opaskars[1]) sought to purchase a new boat from South Shore Lake Erie Assets & Operations, LLC. As part of that new boat purchase, the Opaskars hoped to trade-in their old boat, *The Third Lady*.

These cases stem from a tragic maritime accident that occurred onboard *The Third Lady* partway through the trade-in process. On June 23, 2021, the Opaskars and South Shore scheduled *The Third Lady* for a trade inspection. The Opaskars and South Shore planned to take the *The Third Lady* to a South Shore inspection facility by piloting the boat over Lake Erie. Dr. Frank Opaskar, Christopher Kedas (a South Shore salesperson), and Kedas's minor son were onboard for that trip. Sadly, all three perished on the way to the South Shore

---

[1] The Opaskars' action is brought on behalf of Dr. Frank Opaskar's estate, not Dr. Frank Opaskar himself. For this Order, it is not important to strictly differentiate between Dr. Frank Opaskar and his estate. So, the Court uses the "Opaskars" to refer alternatively to either Gail and Frank Opaskar collectively, or to Gail Opaskar in her individual and estate executrix roles together.

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

inspection facility, apparently due to a mechanical failure that caused lethal carbon monoxide levels to accumulate on *The Third Lady*.

Several lawsuits involving multiple parties soon arose from this accident, including these two cases. With these cases,[2] South Shore and the Opaskars seek liability limitation or exoneration under the Limitation of Liability Act and Supplemental Admiralty Rule F to the Federal Rules of Civil Procedure.

The Limitation of Liability Act availability turns on *The Third Lady*'s ownership. With this Order, the Court addresses *The Third Lady*'s ownership.

Because only shipowners can file Rule F actions to limit their liability, ownership is a threshold issue. Normally, this means that someone who is potentially liable for a maritime accident has an incentive to *assert* ownership. Here, though, both South Shore and the Opaskars *disclaim* ownership. If either party successfully disclaims ownership, the Court must dismiss that party's Rule F action.

The parties originally raised their ownership arguments as summary judgment cross-motions. Because jury trials do not appear to be available in Rule F actions, the Court asked the parties to consider submitting the ownership issue to the Court as a bench trial on a stipulated record.[3] The parties agreed to do so, submitting the ownership issue as a bench trial and using the summary judgment record as the stipulated record.[4]

---

[2] The briefs and record on the ownership issue are mostly identical in both cases before the Court. For ease and consistency, all record citations in this Order are to the first-filed South Shore action (Case No. 1:21-cv-2343). The only difference between the two case records is that one claimant—Candida Lynn Kedas, as executor of Christopher Kedas's estate—filed briefs and exhibits in only the Opaskars' action (Case No. 1:21-cv-2396). The Court has considered the Kedas filings in deciding the ownership issue.

[3] Non-Doc. Order (May 9, 2024).

[4] Docs. 63, 64, 66. The parties also agreed not to file supplemental evidentiary objections as part of this stipulated bench trial, but they reserved their right to raise evidentiary objections regarding the Court's ownership decision in later district court or appellate proceedings. Doc. 69.

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

After carefully reviewing the record and the parties' briefing, the Court concludes that the Opaskars own *The Third Lady* for Rule F purposes, but that South Shore does not. Therefore, the Court **DISMISSES** South Shore's Rule F action and allows the Opaskars' Rule F action to proceed.

## I. FINDINGS OF FACT

In 1988, Dr. Frank Opaskar and Gail Opaskar (then Gail Soinski) purchased a 33' Chris-Craft boat known as *The Third Lady*. Following purchase, the State of Ohio issued a certificate of title for *The Third Lady* in both Frank's and Gail's names.[5]

Some thirty years later, the Opaskars began to consider trading in *The Third Lady* for a new boat. So, in May 2021, the Opaskars began discussing a new boat purchase with South Shore.[6]

On June 15, 2021, those new boat discussions accelerated when South Shore salesperson Christopher Kedas examined *The Third Lady* as part of a preliminary trade-in estimate.[7]

After examining *The Third Lady*, Kedas gave Amanda Opaskar (the Opaskars' daughter) and Gail Opaskar a buyer's quote that tentatively valued *The Third Lady* at a $20,000 trade-in.[8] The buyer's quote specified that the proposed trade-in was "subject to trade inspection."[9] Later that same day, Amanda and Gail made a $5,000 deposit to hold the new South Shore boat they intended to buy while the two sides finalized purchase and trade-in details.[10]

---

[5] Doc. 48-1, Ex. U.
[6] Doc. 48-4 at 75:17–21.
[7] *Id.* at 116:9–12; Doc. 48-3 at 52:9–22.
[8] Doc. 48-3 at 55:8–18; Doc. 48-4 at 129:17–130:8; Doc. 49-5.
[9] Doc. 49-5.
[10] Doc. 48-3 at 55:8–18; Doc. 48-4 at 129:17–130:8.

- 3 -

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

On June 17, 2021, Amanda and Gail made a $9,500 down payment after receiving financing approval for the potential new boat purchase.[11] At the same time, Gail Opaskar attempted to transfer *The Third Lady*'s title to South Shore.[12] However, South Shore refused to accept the title because Dr. Frank Opaskar had not signed the title assignment, South Shore had not yet completed the required trade inspection, and the Opaskars still intended to use *The Third Lady* the following weekend for Father's Day.[13]

Given the Opaskars' plan to use *The Third Lady* over the Father's Day weekend, the Opaskars and South Shore agreed to conduct *The Third Lady*'s trade inspection on June 23, 2021, shortly after Father's Day weekend.[14] The Opaskars and South Shore planned to pilot *The Third Lady* over Lake Erie to a South Shore facility for the trade inspection.[15]

On the June 23, 2021 inspection day, Dr. Frank Opaskar, Kedas, and Kedas's minor son were onboard *The Third Lady* for the trip to South Shore's facility.[16] Unfortunately, *The Third Lady* never made it to South Shore's facility. During the trip, a malfunction caused lethal amounts of carbon monoxide to build up on the boat, killing all onboard.[17]

Ultimately, *The Third Lady*'s trade inspection never happened.[18] And when Amanda and Gail Opaskar ultimately purchased a new boat from South Shore, that purchase did not include *The Third Lady* as a trade-in.[19]

---

[11] Doc. 48-3 at 69:7–70:2; Doc. 48-4 at 47:4–13.
[12] Doc. 48-4 at 47:10–48:12.
[13] Doc. 48-1 at 25:8–20, 77:6–16; *id.*, Ex. U; *see also* Doc. 48-3 at 75:7–12 (confirming that the Opaskars used *The Third Lady* on Father's Day); Doc. 48-4 at 174:2–8 (same).
[14] Doc. 49-10.
[15] Doc. 50-4 at 37:2–39:13.
[16] *Id.*
[17] Doc. 48 at 8; Doc. 49 at 1.
[18] Doc. 48-1 at 73:9–10.
[19] Docs. 70-1 to -5.

- 4 -

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

The Opaskars and South Shore eventually filed competing Rule F actions seeking to disclaim ownership over *The Third Lady*. The Court now resolves the parties' ownership dispute.

## II. CONCLUSIONS OF LAW

### A. Legal Standard

Only a vessel's owners can seek liability limitation under Rule F and the Limitation of Liability Act.[20] Ownership at the time of a maritime accident acts as the relevant factor for determining whether a party may seek liability limitation—ownership changes occurring after the accident do not affect a party's ability to seek liability limitation.[21]

"Ownership" in the Limitation of Liability Act context is "an untechnical word."[22] Courts therefore interpret ownership "in [a] liberal way" and in a "broad and popular sense."[23] This is because the Supreme Court has said that courts should interpret the Limitation of Liability Act to achieve the Act's purpose of encouraging maritime investment.[24] And taking a far-ranging view of ownership encourages maritime investment by making Rule F liability limitation actions more widely available.[25]

Under this broad ownership interpretation, even those who do not hold legal title to a vessel may be owners.[26] Whenever someone "has the type of relationship to the vessel that could subject the person to liability as a shipowner," that person is an owner.[27] In turn,

---

[20] *Flink v. Paladini*, 279 U.S. 59, 62 (1929).
[21] *Calkins v. Graham*, 667 F.2d 1292, 1295 (9th Cir. 1982) (quoting *Am. Car & Foundry Co. v. Brassert*, 61 F.2d 162, 164 (7th Cir. 1932)).
[22] *Flink*, 279 U.S. at 63.
[23] *Id.*
[24] *Id.* at 62–63.
[25] *Id.*
[26] *Leco Corp. v. Grams*, 968 F.2d 1215, at *3 (6th Cir. 1992) (unpublished table decision); *In re Am. Milling Co.*, 409 F.3d 1005, 1014 (8th Cir. 2005); *In re United States*, 259 F.2d 608, 610 (3d Cir. 1958) (citation omitted).
[27] *Leco Corp.*, 968 F.2d 1215, at *3; *see also Dick v. United States*, 671 F.2d 724, 727 (2d Cir. 1982) ("As a general rule, one who is subjected to a shipowner's liability because of his exercise of dominion over a vessel should be able to limit his liability to that of an owner."); *In re United States*, 259 F.2d at 610 ("[W]hether or not one is to be deemed an 'owner'

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

a potentially liability-creating relationship exists when a person exercises dominion and control over that vessel.[28] So, for example, a person with the ultimate responsibility for maintaining and operating the vessel is an owner for Rule F purposes.[29]

That said, the question of who holds legal title is still relevant to the ownership inquiry even though "legal title is not determinative of ownership."[30] Although a person need not hold legal title to a vessel to be that vessel's owner, if a person does hold legal title, that person will usually be an owner for Rule F purposes.[31] This makes sense, as title holders often have responsibilities for their property, and those title holders may be subject to liability for failing to fulfill those responsibilities.

There is one exception to this general rule. When a person (a mortgagee) holds a vessel's legal title solely as collateral to secure a debt, and does not otherwise have possession of the vessel, that person is not an owner for Rule F purposes.[32] Again, this makes good sense. So long as the mortgagee does not attempt to take possession of the vessel after a payment default, the mortgagee plays essentially no role in maintaining or operating the vessel.[33]

---

depends largely upon the possibility that he may be subjected to a liability which ordinarily is assertable against one having, or claiming to have, proprietorship or dominion over the subject of the proceeding.") (quoting *The Milwaukee*, 48 F.2d 842 (E.D. Wis. 1931)).

[28] *In re Am. Milling*, 409 F.3d at 1014 ("The question in general, then, is whether a party who claims the status of owner exercised sufficient dominion and control over the vessel to be an owner pro hac vice even though neither technically a title-holding owner nor a charterer."); *Dick*, 671 F.2d at 727; *In re Exoneration From or Limitation of Liab. of Shell Oil Co.*, 780 F. Supp. 1086, 1089 (E.D. La. 1991).

[29] *In re Lady Jane, Inc.*, 818 F. Supp. 1470, 1474 (M.D. Fla. 1992) (the person "ultimately responsible" for the vessel's "maintenance and operation" is an owner); *Shell Oil Co.*, 780 F. Supp. at 1089; *In re Colonial Tr. Co.*, 124 F. Supp. 73, 76 (D. Conn. 1954)

[30] *Leco Corp.*, 968 F.2d 1215, at *3 (citing *Brassert*, 289 U.S. 261)

[31] *Marine Recreational Opportunities, Inc. v. Berman*, 15 F.3d 270, 271 (2d Cir. 1994) ("[I]n most of the cases that purport to apply a broad interpretation of "owner," the party seeking to limit liability had actual title or was capable of exercising some measure of dominion or control over the vessel at the time of the accident."); *Calkins*, 667 F.2d at 1294 ("[T]he statute has been construed liberally to cover . . . title owners of a vessel."); *In re McDonough Marine Serv.*, 749 F. Supp. 128, 131 (E.D. La. 1990) ("[t]he owner who may limit is usually the person with legal title to the vessel.") (citation omitted).

[32] *Brassert*, 289 U.S. at 265 (citation omitted).

[33] *See Admiral Towing Co. v. Woolen*, 290 F.2d 641, 645 (9th Cir. 1961) (observing that a mortgagee not in possession is not an owner, but a mortgagee who has taken possession is an owner).

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

To summarize: There are two overlapping paths to vessel ownership under the Limitation of Liability Act and Rule F. First, a person can show dominion and control over the involved vessel. Second, a person can show they hold legal title to the vessel and are responsible for the vessel—bare legal title that gives no responsibilities does not suffice.[34]

### B. The Opaskars

The Opaskars own *The Third Lady* because they held legal title at the time of the accident. The Opaskars received *The Third Lady*'s title in their name when they purchased *The Third Lady*.[35] The Opaskars then continuously held that title up through the June 23, 2021 accident.[36] Although Gail Opaskar attempted to transfer title to South Shore shortly before the accident, South Shore refused to accept the title.[37] Since nothing suggests that the Opaskars held title merely as mortgagees, the Opaskars are owners who may bring a Rule F action.

Using dominion and control analysis leads to the same conclusion. As both Gail and Amanda Opaskar testified, the Opaskars had the final authority to order and approve *The Third Lady* maintenance work.[38] The Opaskars' control over *The Third Lady*'s maintenance is enough to make them owners.[39]

Therefore, the Opaskars can proceed with their Rule F action as *The Third Lady*'s owners.

---

[34] Even if a person does not formally hold legal title, that person may still be an owner under legal title analysis if she holds some other interest to the legal title that would enable her to claim legal title. *See infra* Section II.C.
[35] Doc. 48-1, Ex. U.
[36] In fact, the Opaskars still hold *The Third Lady*'s title today. Doc. 48-4 at 43:5–17.
[37] *Id.* at 47:10–48:12.
[38] Doc. 48-3 at 24:11–18, 25:9–26:16, 36:2–21 (Amanda Opaskar); Doc. 48-4 at 52:10–53:9, 68:2–13 (Gail Opaskar).
[39] *See supra* note 30.

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

### C. South Shore

South Shore did not own *The Third Lady* at the time of the accident even though the Opaskars hoped to trade-in *The Third Lady* to South Shore.

As an initial matter, the Court's finding that the Opaskars were owners does not necessarily mean South Shore cannot also be an owner. Rule F ownership can be joint,[40] so South Shore's ownership depends on whether South Shore satisfies either ownership test, not on the Opaskars' ownership.

#### 1. Legal Title

The Court begins with legal title analysis. As the Court discussed above, the Opaskars hold legal title, not South Shore.[41] But that does not end the legal title inquiry. Courts have found that, even if a party does not formally hold legal title, that party may still be an owner if it holds some other interest in the legal title.

For example, in *Admiral Towing*, the Ninth Circuit held that "a mortgagee [who] . . . comes into possession and control of a vessel as the first step in a process which is to culminate uninterruptedly in his becoming the holder of legal title to her . . . becomes an owner for purposes of limiting his liability."[42] And in *Leco*, the Sixth Circuit found that a binding agreement for a marina to accept a vessel as a trade-in made that marina an owner, even if legal title had not yet passed to the marina.[43]

Taken together, these two examples show that, when someone has an enforceable right to receive a vessel's legal title and the title transfer is only pending completion of formalities, the person with such an enforceable right to the title is an owner.

---

[40] *See, e.g., Admiral Towing*, 290 F.2d at 645 (citing *In re Colonial Trust*, 124 F. Supp. 73).
[41] *Supra* Section II.B.
[42] *Admiral Towing*, 290 F.2d at 645.
[43] *Leco Corp.*, 968 F.2d 1215, at *3.

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

The Opaskars argue that the situation here is similar to the *Leco* situation, because *The Third Lady's* maritime accident occurred while the Opaskars were in the process of trading it in. But there is one key difference between *Leco* and this case: There was a binding and enforceable trade-in agreement in *Leco*, while any *The Third Lady* trade-in agreement was contingent on a successful trade inspection. Put differently, a successful trade inspection was a condition precedent to the proposed trade-in agreement in this case.

Under Ohio law,[44] "[a] condition precedent is an occurrence that must take place before a contractual obligation becomes effective."[45] If a condition precedent does not occur, there is no enforceable agreement.[46] Because the required trade inspection did not occur, there was no enforceable trade-in agreement, unlike in *Leco*.

To the extent the Opaskars argue that a trade inspection was not a condition precedent, the Court disagrees.

Whether a provision is a condition precedent "is a question of the parties' intent."[47] To determine intent, courts look to "the language of the particular provision, the language of the entire agreement, and the subject matter of the agreement."[48] Courts can also look to parol evidence to establish a condition precedent.[49] However, parol evidence that contradicts a contract's express written terms cannot show a condition precedent.[50] And

---

[44] Even though federal admiralty law defines ownership for Rule F purposes, courts turn to state law to determine whether a binding agreement exists that can satisfy the federal test for ownership. *See Leco Corp.*, 968 F.2d 1215, at *3 (citing Michigan contract law).
[45] *Campbell v. George J. Igel & Co.*, 3 N.E.3d 219, 223 (Ohio Ct. App. 2013) (citation omitted).
[46] *Sabatine BK Dev., LLC v. Fitzpatrick Enters., Inc.*, 85 N.E.3d 1127, 1134 (Ohio Ct. App. 2017).
[47] *Evans, Mechwart, Hambleton & Tilton, Inc. v. Triad Architects, Ltd.*, 965 N.E.2d 1007, 1013 (Ohio Ct. App. 2011).
[48] *Id.*
[49] *Campbell*, 3 N.E.3d at 225 (citation omitted).
[50] *Id.* (citation omitted).

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

because conditions precedent are disfavored, courts should not construe contractual provisions as conditions precedent unless the parties' intent is clear.[51]

Here, the relevant agreement is the buyer's quote that South Shore salesperson Christopher Kedas gave to the Opaskars.[52] The buyer's quote lists *The Third Lady* (identified as a 1987 Chris-Craft Amerosport) as a potential trade-in and estimates the trade-in value at $20,000.[53] The buyer's quote also specifies that this trade-in was "subject to trade inspection."[54] The phrase "subject to" suggests that trade inspection is a condition precedent.[55]

Of course, the "subject to trade inspection" provision has another reasonable interpretation. Rather than the "subject to trade inspection" provision establishing a condition precedent, it could have been establishing an open price term that simply deferred setting a reasonable trade-in value for later.[56] If this latter interpretation were correct, the parties may have had a binding trade-in agreement subject to an open price term.

The Sixth Circuit adopted this kind of open price term interpretation in *Leco*: Even though the *Leco* trade-in was subject to inspection that could adjust trade-in value, there was still a final, binding trade-in agreement that established ownership.[57]

In this case, though, the parol evidence shows that a trade inspection was a condition precedent rather than part of an open price term.

---

[51] *Campbell*, 3 N.E.3d at 223 (citation omitted).
[52] Doc. 49-5.
[53] *Id.*
[54] *Id.*
[55] *Campbell*, 3 N.E.3d at 225; *see also Sabatine*, 85 N.E.3d at 1134 (finding that a contractual provision using "subject to" imposed a condition precedent)
[56] *See* Ohio Rev. Code § 1302.18.
[57] *Leco Corp.*, 968 F.2d 1215, at *3 (citing the Michigan equivalent of Ohio Rev. Code § 1302.18).

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

South Shore's employees consistently testified that South Shore's practice was to make trade-ins contingent on a successful trade inspection.[58] In other words, South Shore intended to make trade inspection a condition precedent.

The way South Shore structured its contracts also supports this intent. The South Shore buyer's quote says, "At time of closing the Buyer's Quote will be replaced with a state compliant Purchase Agreement."[59] In turn, South Shore's purchase agreement says, "On the date of this Agreement, the trade-in will become your property . . . ."[60] Based on this language, the purchase agreement is supposed to be the final trade-in agreement. And the purchase agreement then supersedes the buyer's quote. So, the best way to view the buyer's quote is as a temporary placeholder for the final purchase agreement, and the best way to interpret the "subject to trade inspection" language is as a condition precedent.

The Opaskars also gave evidence that the trade inspection was a condition precedent.[61] Amanda Opaskar testified that she understood *The Third Lady* needed to pass a trade inspection before South Shore would even accept *The Third Lady* as a trade:

> **Q:** [D]id [South Shore salesperson] Chris [Kedas] tell you that the trade in vessel had to be mechanically inspected before it could be accepted as a trade?
> **A:** Yes.
> **Q:** So you knew that from the beginning?
> **A:** Yes.[62]

There is also documentary evidence showing Kedas texted Amanda Opaskar to say that South Shore "will need to complete the trade inspection/mainly compression check on the

---

[58] Doc. 48-1 at 73:11–74:11 (explaining that South Shore had rejected proposed trade-ins after inspection); Doc. 48-5 at 152:14–153:10 (stating that either South Shore or a prospective buyer could back out of a potential trade-in proposal from a buyer's quote).
[59] Doc. 49-5.
[60] Doc. 48-7 (Additional Terms and Conditions § 12A).
[61] There is some testimony that the Opaskars believed *The Third Lady*'s trade-in value was still to be determined, like an open price term. *E.g.*, Doc. 48-3 at 94:4–21. But this does not mean there was no condition precedent—there could be a condition precedent *and* the final trade-in value could still be in flux.
[62] *Id.* at 60:12–17.

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

motors before completing the closing."[63] And Amanda Opaskar testified that she understood this and other Kedas texts to mean that trading in *The Third Lady* was conditional on a successful inspection.[64]

That said, there is some evidence that Gail Opaskar may have thought differently. Gail testified that she did not believe a trade inspection was necessary and that South Shore and the Opaskars had already reached a final trade-in deal.[65] However, the Court does not find this testimony persuasive.

For one, Gail Opaskar is the only witness who testified that a trade inspection was not required before closing the proposed trade-in. All three other witnesses who testified on that point agreed that a trade inspection was required.

Moreover, Gail Opaskar admitted that she was not the person primarily charged with negotiating with South Shore over the proposed trade-in. Gail specifically asked her daughter, Amanda, to "take point on" discussions with South Shore.[66] Gail also conceded that her understandings about the proposed trade-in sometimes differed from Amanda's understandings.[67] Given that Amanda oversaw the South Shore negotiations, the Court weighs Amanda's understandings about any South Shore agreement over Gail's understandings.

The Opaskars' remaining argument for a binding trade-in agreement is not convincing either. The Opaskars say that two deposits they made with South Shore, combined with

---

[63] Doc. 49-9 at PageID #: 844.
[64] Doc. 48-3 at 75:16–23; *see also id.* at 74:9–75:1 (Amanda Opaskar discussing a Kedas text message indicating that the parties could move forward "if all were a go," and explaining her understanding that this meant an inspection was required before moving forward); Doc. 49-9 at PageID #: 842 ("if all were a go" text message).
[65] Doc. 48-4 at 140:9–142:24; Doc. 49-1 at 198:1–7.
[66] Doc. 49-1 at 106:11–17.
[67] *Id.* at 143:16–144:5.

- 12 -

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

internal South Shore notices (a "sold" notice and "in contract" notice[68]), establish that there was a binding trade-in agreement between the two parties.

The first $5,000 deposit simply held the new boat that the Opaskars were trying to buy. This did not complete any sale; it simply ensured South Shore would not sell that new boat to another customer while the Opaskars sorted through purchase details.[69]

In the same vein, the internal South Shore notices show only that the Opaskars were in the process of purchasing a new boat, not that there was a final agreement. As one South Shore employee explained, the "sold" notice, despite its name, merely holds a boat so that South Shore and its affiliates would not sell it to someone else.[70] The "sold" notice did not mean there had been a final sale.[71]

And the "in contract" notice refers only to the buyer's quote—the placeholder for the final purchase agreement—not any final sale or trade-in contract.[72]

Finally, the Opaskars' second $9,500 deposit did not create a final trade-in agreement either. That second deposit was a down payment towards purchasing a new boat[73] and might suggest that the Opaskars and South Shore were moving towards a final new boat purchase.

The new boat purchase and the proposed trade-in are related, but separate transactions. No record evidence shows that the trade-in *must* go forward if the new boat purchase goes forward. And the discussed trade-in was relatively small against the backdrop of the expensive new boat purchase.[74] The Opaskars could well have purchased the new

---

[68] Docs. 49-6, -7.
[69] Doc. 48-3 at 55:13–18.
[70] Doc. 48-5 at 195:21–196:20.
[71] *Id.*
[72] *Id.* at 55:21–56:11.
[73] Doc. 48-3 at 69:7–70:2; Doc. 48-4 at 47:4–13.
[74] *See* Doc. 49-5.

- 13 -

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

boat without trading in *The Third Lady*. So, the Opaskars' step towards finalizing their new boat purchase was not a step towards trading in *The Third Lady*.

In sum, the buyer's quote and parol evidence show that the Opaskars and South Shore intended a completed *The Third Lady* inspection to be a condition precedent to any finalized trade-in agreement. Since South Shore was never able to conduct its trade inspection of *The Third Lady*,[75] there was no enforceable trade-in contract giving South Shore an enforceable right to *The Third Lady*'s legal title. Therefore, South Shore is not an owner under the legal title test.

### 2. Dominion and Control

Applying the dominion and control test also shows that South Shore did not own *The Third Lady*.

The Opaskars concede that South Shore was not ultimately responsible for *The Third Lady*'s maintenance in the days leading up to the June 23, 2021 accident.[76] Instead, the Opaskars held final responsibility for maintenance.[77]

Nor do South Shore's other interactions with *The Third Lady* demonstrate dominion or control. The Opaskars emphasize that South Shore, through Christopher Kedas, arranged for *The Third Lady* to be transported to a South Shore inspection facility on the day of the accident.[78] They say this shows South Shore's control over *The Third Lady*.

But Kedas arranged the transportation because *The Third Lady* would be arriving at a South Shore facility, not because South Shore already owned or controlled *The Third Lady*. Since *The Third Lady* was supposed to be stored and inspected at a South Shore facility, any

---

[75] Doc. 48-1 at 73:9–10.
[76] Doc. 48-4 at 68:11–69:5, 75:2–7 (Gail Opaskar).
[77] Doc. 48-3 at 24:11–18, 25:9–26:16, 36:2–21 (Amanda Opaskar); Doc. 48-4 at 52:10–53:9, 68:2–13 (Gail Opaskar).
[78] Doc. 49 at 18 (citing record evidence).

- 14 -

Case Nos. 1:21-cv-02343, 1:21-cv-02396
GWIN, J.

transport would have to fit South Shore's schedule—the Opaskars could not show up unannounced.

Likewise, the fact that Kedas granted permission for Dr. Frank Opaskar and Kedas's minor son to join *The Third Lady*'s journey to the South Shore facility[79] does not show South Shore's control over *The Third Lady*.

Finally, evidence showing that, before the June 23, 2021, trip to South Shore's facility, the Opaskars gave Kedas the keys to *The Third Lady* and that Kedas paid for *The Third Lady*'s fuel do not establish ownership.[80] The Opaskars gave Kedas the keys so that South Shore could inspect the boat. The Opaskars no more handed ownership and dominion over to South Shore by doing so than a person handing car keys to a mechanic would be giving up car ownership to the mechanic. And Kedas paying for fuel was simply a courtesy, not control over *The Third Lady*.

As such, South Shore did not have sufficient dominion and control over *The Third Lady* to be an owner.

\* \* \*

For the reasons given above, the Court finds that the Opaskars owned *The Third Lady* at the time of the accident at issue, but South Shore did not own *The Third Lady*. Therefore, the Court **DISMISSES** South Shore's Rule F action (Case No. 1:21-cv-2343) and allows the Opaskars' Rule F action (Case No. 1:21-cv-2396) to proceed.

IT IS SO ORDERED.

Dated: July 8, 2024　　　　　　　　　　　　*s/　　　James S. Gwin*
　　　　　　　　　　　　　　　　　　　　　JAMES S. GWIN
　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

---

[79] Doc. 49 at 18 (citing record evidence).
[80] *Id.*